IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-01883-PAB

IZRA H. MENGESHA,

        Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

        Defendant.

_____

**ORDER**
_____

      This matter comes before the Court on the Complaint [Docket No. 1] filed by

plaintiff Izra Mengesha.  Plaintiff seeks review of the final decision of defendant Carolyn

W. Colvin (the "Commissioner") denying his claim for supplemental security insurance

under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381-83c.[1]  The

Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C.

§ 405(g).

## I. BACKGROUND

      On November 5, 2010, plaintiff applied for supplemental security income and

disability insurance.  R. at 11.  Plaintiff alleged that he had been disabled since

November 5, 2010.  *Id.*[2]  After an initial administrative denial of his claim, plaintiff

_____

     [1]The Court has determined that it can resolve the issues presented in this matter
without the need for oral argument.

     [2]Although the Administrative Law Judge's ("ALJ") decision states that plaintiff
later amended his onset date to November 1, 2010, R. at 11, the parties and the ALJ
continue to refer to plaintiff's onset date as November 5, 2010.  *See, e.g.*, R. at 16;

received a hearing before an ALJ on September 24, 2012.  *Id.*  At the hearing, plaintiff

voluntarily withdrew his request for a hearing as to his application for disability and

disability insurance.  *Id.*  On October 19, 2012, the ALJ issued a decision denying

plaintiff's claim.  *Id.* at 21.  The ALJ found that plaintiff had the following severe

impairments: back and neck pain, adjustment disorder with depressed mood, dysthymic

disorder, borderline personality disorder, and paranoid personality disorder.  R. at 14.

The ALJ concluded that these impairments, alone or in combination, did not meet one

of the regulations' listed impairments, *id.*, and ruled that plaintiff had the residual

functional capacity ("RFC") to

> perform medium work as defined in 20 CFR 416.967(c) except where he is
> not required to climb scaffolds, ladders and ropes.  He is not required to work
> at unguarded heights or near unguarded hazardous mechanical equipment.
> He is not required to understand, remember, and carry out more than simple
> instructions.  He is not required to have more than superficial interaction with
> co-workers nor required to interact with the public.

R. at 15.  Plaintiff had no past relevant work, but, based upon this RFC and in reliance

on the testimony of a vocational expert ("VE"), the ALJ concluded that plaintiff was not

disabled as "there are jobs that exist in significant numbers in the national economy that

the claimant can perform."  R. at 20.

The Appeals Council denied plaintiff's request for review of this denial.  R. at 1.

Thus, the ALJ's decision is the final decision of the Commissioner.

---

Docket No. 17 at 17.  The difference in onset dates does not, however, appear to be
material to the ALJ's decision or this appeal.

## II.  ANALYSIS

### A.  Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *See Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003).  The district court may not reverse an ALJ simply because the court may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision.  *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  The district court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Flaherty*, 515 F.3d at 1070.  Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### B.  The Five-Step Evaluation Process

To qualify for disability benefits, a claimant must have a medically determinable

physical or mental impairment expected to result in death or last for a continuous period

of twelve months that prevents the claimant from performing any substantial gainful

work that exists in the national economy.  42 U.S.C. § 423(d)(1)-(2).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical
> or mental impairment or impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists
> in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006).  The Commissioner has established a five-step

sequential evaluation process to determine whether a claimant is disabled.  20 C.F.R.

§ 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  The steps of the

evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has
> a severe impairment; (3) whether the claimant's impairment meets an
> impairment listed in appendix 1 of the relevant regulation; (4) whether the
> impairment precludes the claimant from doing his past relevant work; and (5)
> whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R.

§ 404.1520(b)-(f)).  A finding that the claimant is disabled or not disabled at any point in

the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of

Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

The claimant has the initial burden of establishing a case of disability.  However,

"[i]f the claimant is not considered disabled at step three, but has satisfied her burden of

establishing a prima facie case of disability under steps one, two, and four, the burden

shifts to the Commissioner to show the claimant has the residual functional capacity

(RFC) to perform other work in the national economy in view of her age, education, and work experience." *See Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987).  While the claimant has the initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts." *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991).

### C.  The ALJ's Decision

#### 1.  Discussion of Evidence

Plaintiff argues that the ALJ decision mischaracterized evidence in multiple instances.  *See* Docket No. 17 at 14-17.  Although not explicitly styled as such, such arguments primarily constitute an invitation to reweigh the evidence, an invitation which the Court declines.  *See Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (reiterating that courts "review only the *sufficiency* of the evidence, not its weight" (emphasis in original)).  Nonetheless, the Court finds that there are sufficient deficiencies in the ALJ's factual findings as to merit remand.

In making a credibility determination regarding the severity of plaintiff's claimed mental symptoms, the ALJ discussed plaintiff's November 2010 visit to Denver Health Medical Center Psychiatric Emergency Services.  R. at 17.  The ALJ then states, "Later records thru November of 2011 are absent of any psychological complaints." *Id.*  The ALJ discussed plaintiff's visits to treatment providers for his physical conditions, noting that such records contain no mention of mental health problems.  *Id.*  The ALJ then concludes that plaintiff "was not seen again for help with his mental health until 2012."

*Id.* The ALJ appears to have concluded that, in the context of evaluating the severity of plaintiff's claimed mental limitations, the gap in plaintiff's mental health treatment and lack of psychological complaints undercut plaintiff's credibility. However, the ALJ's conclusion that plaintiff did not receive mental health treatment between November 2010 and 2012 is directly contradicted by the record. On June 14, 2011, plaintiff visited Denver Health complaining of hearing voices and was treated for a mood disorder and anxiety. R. at 373. On July 21, 2011, plaintiff appears to have visited Denver Health where he was treated for psychotic disorder. R. at 370. In light of the ALJ's apparent conclusion that plaintiff did not receive mental health treatment from November 2010 to 2012, and the adverse conclusion he appears to have drawn regarding plaintiff's credibility, the ALJ's failure to discuss these visits requires remand.[3]

On January 11, 2011, plaintiff underwent a consultative mental examination with Dr. Charles Renne. R. at 273-275. Plaintiff argues that, in recounting Dr. Renne's opinion, the ALJ erred in concluding that plaintiff reported to Dr. Renne "that in his past work he had gotten along well with other co-workers and his supervisor." Docket No. 17 at 14 (citing R. at 18). Plaintiff contends that the ALJ's conclusion is contrary to what plaintiff told Dr. Renne. Plaintiff told Dr. Renne that he was let go from his job as a stocker at Bed, Bath, and Beyond in 2007

> because he felt "paranoid" around people, could not trust them and when they conversed he thought they were saying negative things about him. His thoughts would race and he would be tense around the managers and find it hard to concentrate and do the work. When asked his reaction

---

[3]Although plaintiff did not explicitly argue that this aspect of the ALJ's decision requires remand, plaintiff's statement of facts identifies both treatment notes with citation to the record. Docket No. 17 at 8.

> around people on other jobs he said he generally has felt the same with
> the exception of his first job at age 16 when he worked with youngsters at
> a recreation park.  There he had good relationships with fellow workers
> and supervisor, and later on one other job he worked for a supervisor who
> was very supportive and there he had no difficulty.

R. at 274.  In recounting this portion of Dr. Renne's report, the ALJ correctly noted that

plaintiff had difficulty with his co-workers and supervisors at Bed, Bath, and Beyond in

2007, but then concluded that plaintiff told Dr. Renne that "in his past work he had

gotten along well with other co-workers and his supervisor."  R. at 18.  Although it may

be technically correct to state that plaintiff had gotten along well with co-workers and his

supervisor during his first job at the age of 16 and at one additional job where the

supervisor was "very supportive," the ALJ's conclusion was much broader and ignores

plaintiff's statement that he experienced paranoid feelings similar to his experience at

Bed, Bath, and Beyond and "on other jobs."  *Id.*  Although the ALJ is permitted to

resolve inconsistencies in the record, the Court is not convinced that the ALJ's

characterization of Dr. Renne's report on this issue is supported by substantial

evidence.

Plaintiff challenges the ALJ's conclusion that plaintiff's hearing testimony on the

issue of auditory hallucinations was "vastly different" from what plaintiff told Dr. Renne

on the subject.  Docket No. 17 at 15.  The ALJ found that,

> [a]t the hearing, he testified that the voices told him to do bad things such
> as steal items, yet he told Dr. Renne that the voices were simply critical of
> him.  He denied that they told him to do harm to himself or others.  He
> stated that he only "occasionally hears voices" and that he did not hear
> them during his session nor did he appear to hear or be responding to any
> internal stimuli.

R. at 18.  Plaintiff contends that he sufficiently explained this inconsistency at the

7

hearing with the following testimony: "Q  Do you remember telling [Dr. Renne] that you heard voices coming out of walls?  A  I mean, I guess I did.  I, you know, that's probably what I was going through at that time, so yes."  R. at 55.  Plaintiff argues that such testimony "is a clear indication that Mr. Mengesha's symptoms have not been exactly the same over the several years that he has experienced them and credibly explains why his symptoms might have been a little different 18 months earlier when he saw Dr. Renne."  Docket No. 17 at 15.  Such an argument is, however, no more than an assertion that the ALJ should have afforded greater weight to that particular line of testimony in reaching a conclusion regarding the severity of plaintiff's symptoms, an argument which the Court will not entertain.  The ALJ is permitted to resolve inconsistencies in the record.   Moreover, contrary to plaintiff's suggestion, his hearing testimony regarding hallucinations was not limited in time to his current symptoms.  *See* R. at 43-44 (Q  When did that kind of thing start for you?  A  That started happening back in '07, '08; 2008, 2008.").  Plaintiff testified that in 2010 or 2011 the voices in his head told him to steal something, R. at 44-45, a incident which he did not share with Dr. Renne during his January 2011 examination of plaintiff despite being asked about his legal issues.  *See* R. at 274.  Although the ALJ may have engaged in an overstatement when concluding that plaintiff provided "vastly different" information to Dr. Renne, substantial evidence otherwise supports the ALJ's conclusion on this issue.  *Compare* R. at 43-45 with R. at 274.

Plaintiff argues that the ALJ improperly evaluated his Global Assessment Functioning ("GAF") scores.  Docket No. 17 at 15-16.  Plaintiff is first critical of the ALJ's

characterization of the GAF score[4] of 50 plaintiff received while being treated at Denver Health in November 2010.  *Id.* at 15.  The ALJ noted that a GAF score of 50 indicates serious symptoms, but assigned "this one time evaluation score little weight as it is internally inconsistent with the claimant's presentation at the evaluation and unsupported by his minimal symptomatology complaints."  R. at 17.  Plaintiff argues that, because, in 2012, plaintiff was also assigned GAF scores of 50-55 when he was treated at Denver Health, R. at 299, 304, the ALJ improperly discounted the November 2010 GAF score as being a "one time" event.  Docket No. 17 at 15.  The ALJ's decision regarding plaintiff's November 2010 GAF score is somewhat vague.  It is unclear whether the ALJ assigned the GAF score little weight in determining whether plaintiff's mental limitations were disabling or whether the ALJ second guessed plaintiff's treating physician's GAF score and thereby improperly substituted her medical judgment for that of the plaintiff's treating physician.  The ALJ may wish to further clarify this issue on remand.

Plaintiff argues that the ALJ incorrectly characterized GAF scores between 50-55 as indicating moderate limitations.  Docket No. 17 at 16.  The ALJ found that, when plaintiff visited Denver Health in 2012, "he was assigned a GAF score of 50 to 55 indicating not more than 'moderate' limitations, which would not support greater restrictions than those determined in the residual functional assessment by the undersigned."  R. at 17.  Plaintiff is correct that a GAF score in the range of 41-50

---

[4]The GAF "is a subjective determination based on a scale of 1-100 of 'the clinician's judgment of the individual's overall level of functioning.'" *Salazar v. Barnhart*, 468 F.3d 615, 624 n.4 (10th Cir. 2006) (quotations omitted).

indicates "'[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as inability to keep a job." *Langley v. Barnhart*, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (text revision 4th ed. 2000)).  However, a GAF score of 51-60 "indicates moderate symptoms, such as a flat affect, or moderate difficulty in social or occupational functioning." *Id.*  To the extent the ALJ's characterization of a GAF score of 50-55 as "indicating not more than 'moderate' limitations" intimates that a GAF score of 50 reflects only moderate symptoms, the ALJ's characterization is technically incorrect, *see* R. at 17, but plaintiff does not establish that such an error is material.  Moreover, the ALJ's decision otherwise indicates that he was well aware of the various GAF score ranges.  The ALJ noted that a GAF score of 50 indicates serious symptoms, R. at 17, whereas a GAF score of 55 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  R. at 18 (quoting *Diagnostic and Statistical Manual of Mental Disorders 32* (4th ed. 2000)).  Thus, plaintiff's argument fails to identify reversible error in this aspect of the ALJ's decision.

Plaintiff argues that if the ALJ "had properly considered Mr. Mengesha's GAF scores of 50, he should have found Mr. Mengesha disabled."  Docket No. 17 at 16. However, although GAF scores, especially those of fifty or less that suggest an inability to keep a job, should not be ignored, there is no indication that the ALJ did so in this case.  *See Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (unpublished).  The

ALJ discussed plaintiff's November 13, 2010 GAF score of 50, R. at 17, and, with respect to the 2012 GAF score range of 50-55, plaintiff does not provide any reason why the ALJ was required to credit only the lowest score in that range to the exclusion of all other scores within that range.  Moreover, as plaintiff recognizes, "[s]tanding alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work."  *Lee*, 117 F. App'x at 678.  Plaintiff's argument is therefore insufficient to establish reversible error.

Plaintiff interprets the ALJ's decision as a concluding that plaintiff was "merely lazy rather than impaired" and bases such an interpretation on the ALJ's discussion of plaintiff's work history and the lack of pre-onset date medical records.  Docket No. 17 at 16.  In evaluating plaintiff's allegation that he had been unable to work since November 5, 2010, the ALJ noted that

> the evidence suggests the claimant has a habitual disinclination for activity, with a review of the claimant's work history showing the claimant was not working prior to his alleged onset date of disability, and in fact the claimant has only worked sporadically his entire life, which raises a question as to whether the claimant's continuing unemployment is actually due to any medical impairment.  Moreover, the claimant originally alleged that he has been unable to work since 2007 yet there are no medical records available prior to his amended date of onset to support that he sought any treatment for his supposed severe and disabling conditions, which further erodes his credibility.

R. at 16-17 (citations omitted).  "Credibility determinations are peculiarly the province of the finder of fact" and the Tenth Circuit will uphold such determinations, so long as they are supported by substantial evidence.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).  Plaintiff's earnings records support the ALJ's conclusion that plaintiff worked only sporadically before his alleged onset date; between 2004 and 2011, plaintiff

earned a total of less than $8000.  *See* R. at 197.  This aspect of the ALJ's credibility determination is therefore "closely and affirmatively linked" to evidence in the record. *Kepler*, 68 F.3d at 391.

Plaintiff, however, focuses on the ALJ's discussion of the lack of medical records from before the onset date, arguing that he had no obligation to provide such records and that his credibility is actually enhanced by the fact that he knowingly surrendered his rights to disability insurance benefits.  Docket No. 17 at 16-17.  An ALJ may appropriately consider a claimant's pre-onset date work history and medical records in evaluating a claimant's credibility.  *See Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir. 1995) ("[T]he the ALJ did not err in considering that plaintiff quit working [and did not consistently seek medical treatment] several years before the alleged onset of her disability.  Nor did he place undue emphasis on this factor, but considered it as one of several factors bearing on plaintiff's credibility.").  Simply because it is possible to draw two inconsistent conclusions from the evidence "does not prevent an administrative agency's findings from being supported by substantial evidence."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotations omitted).  The Court is not empowered to displace the ALJ's conclusion merely because it would have decided the matter differently if the standard of review had been de novo.  *See id*.  Plaintiff therefore fails to establish reversible error in this aspect of the ALJ's decision.

### 2.  Medical Opinions

A treating physician's opinion is entitled to controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R.

§ 404.1527(c)(2).  The Tenth Circuit has articulated a two-step test for determining

whether the opinion of a treating source is entitled to controlling weight:

> An ALJ must first consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." SSR 96–2p, 1996 WL 374188, at *2 (quotations omitted).  If the answer to this question is "no," then the inquiry at this stage is complete.  If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record.  *Id.*  In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight.  *Id.*

*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  "A finding that a treating

source's medical opinion is not entitled to controlling weight does not mean that the

opinion is rejected.  It may still be entitled to deference and be adopted by the

adjudicator."  SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996).  The level of

deference accorded a non-controlling opinion of a treating physician depends on a

number of factors, including the length of the treating relationship, the nature and extent

of the relationship, the supportability of the opinion and its consistency with the record

as a whole, and the physician's medical specialization.  20 C.F.R. § 404.1527(c)(2)-(6).

An ALJ need not expressly discuss the application of each factor to each medical

opinion, so long as the ALJ's opinion is "sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's medical

opinion and the reasons for that weight."  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th

Cir. 2007) (internal citations omitted).  "When a treating physician's opinion is

inconsistent with other medical evidence, the ALJ's task is to examine the other

physicians' reports to see if they outweigh the treating physician's report, not the other

13

way around." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (internal citations omitted).

Due to the lack of a treating relationship between plaintiffs and non-treating physicians, the opinions of such physicians "are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources." SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). "[B]ecause nonexamining sources have no examining or treating relationship with [claimants], the weight [an ALJ] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions" and "the degree to which these opinions consider all of the pertinent evidence in [a] claim, including opinions of treating and other examining sources." 20 C.F.R. § 404.1527(c)(3).

Omitting a sufficiently thorough explanation for the weight given to the opinion of a treating physician (if given less than controlling weight) or for the weight given the opinion of a nonexamining physician is grounds for remand. *See Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) (remanding denial of benefits because ALJ improperly rejected the treating physician's opinion and relied instead on the findings of a non-treating physician, which the court found to be "of suspect reliability"); *Andersen v. Astrue*, 319 F. App'x 712, 728 (10th Cir. 2009) (unpublished) (remanding denial of benefits where ALJ failed to indicate weight accorded to treating physician's opinion and failed to supply "good reasons" for according opinion that weight). Similarly, "[u]nless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical . . . consultant." 20 C.F.R. § 416.927(e)(2)(ii).

14

Plaintiff argues that the ALJ should have given the opinion of Denver Health psychologist Dr. Verena Roberts greater, if not controlling, weight.  Docket No. 17 at 18-19.  Rather than address the relevant standard, plaintiff merely identifies other evidence in the record that he contends is consistent with Dr. Roberts' opinion.  Thus, plaintiff's argument is both an implicit invitation to reweigh such evidence and unresponsive to the relevant question, namely, whether the ALJ applied the appropriate legal standard in discounting Dr. Roberts' opinion.  Although the Court does not find that plaintiff has appropriately raised a challenge to the ALJ's treatment of Dr. Roberts' opinion, the Court will nonetheless discuss the ALJ's reasons for assigning Dr. Roberts' opinion little weight.

Dr. Roberts initially evaluated plaintiff on June 1, 2012, where she diagnosed him with "Mood Disorder NOS, PTSD, and Psychosis NOS."  R. at 399; *see also* R. at 304.[5]  She also appears to have signed a note dated June 27, 2012, R. at 299, where he reported, among other things, difficulties with his girlfriend and "voices and some paranoid thinking."  R. at 299.  The June 27, 2012 note listed plaintiff's diagnosis as PTSD and a mood disorder and assigned him a GAF score of 50-55.  *Id.*; *see also* Docket No. 17 at 8.  Dr. Roberts later submitted an undated letter describing plaintiff's current mental health, but declined to complete a functional disability assessment.  R. at 399.  She states that, on September 5, 2012, plaintiff's diagnosis was changed to "Bipolar I, MRE depressed with psychotic features" and that plaintiff is

---

[5]The notes from plaintiff's visits with Dr. Roberts are mostly illegible.  Thus, the Court relies on the parties' interpretations of the notes, which do not appear to differ in substantial part.  *Compare* Docket No. 17 at 8, *with* Docket No. 20 at 17.

receiving symptom-focused treatment regarding his bipolar diagnosis . . . in the form of supportive therapy and symptom monitoring regarding medication management via his primary care provider.  Mr. Mengesha is experiencing multiple situational stressors in conjunction with limited resources, which appear to contribute to his overall difficulties with effective mood regulation at this time and may likely impair his ability to function adequately in his environment.

*Id.*[6]

Although Dr. Roberts letter does not indicate what type of "environment" she refers to, the ALJ interpreted Dr. Roberts' letter as an opinion that plaintiff would be impaired in his ability to function adequately in a work environment and assigned the opinion little weight.  R. at 18-19.  The ALJ noted that the record showed only a single meeting between plaintiff and Dr. Roberts, that no other treatment records exist, and that the legible notes "do not support his subjective complaints nor does the record as a whole."  R. at 19 (citing R. at 299).  The ALJ further found that Dr. Roberts' opinion appeared based upon plaintiff's subjective complaint because "no treatment notes indicate that any provider has observed him responding to internal stimuli" and because Dr. Roberts "failed to provide specific limitations which would affect the claimant's ability to work."  *Id.*

As to the question of whether the ALJ appropriately determined that Dr. Roberts' opinion was not entitled to controlling weight, the ALJ concluded that Dr. Roberts' opinion was not supported by her own treatment notes and was inconsistent with the record as a whole, including that no other providers observed plaintiff responding to internal stimuli.  R. at 19.  In so concluding, the ALJ sufficiently explained his reasons

---

[6]The parties do not cite to, and the record does not appear to contain, treatment notes from September 5, 2012.

for not affording Dr. Roberts' opinion controlling weight.  *See Watkins*, 350 F.3d at 1300.

The Court therefore turns to the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6).  As for the length of the treating relationship, although neither party raises this issue, the ALJ may have incorrectly concluded that Dr. Roberts' treating relationship consisted only of the June 1, 2012 visit, without recognizing the fact that Dr. Roberts appears to have signed the June 27, 2012 note.  The Court cannot, however, conclude that the fact that Dr. Roberts signed the June 27, 2012 note overwhelms the ALJ's conclusion that Dr. Roberts did not have a lengthy treating relationship with plaintiff. *See Musgrave*, 966 F.2d at 1374.  Dr. Roberts' letter failed to mention a June 27, 2012 visit; thus, it is not entirely clear that the opinion expressed in the letter was based upon any interactions with plaintiff on that date.  Moreover, although the ALJ does not appear to have recognized the possibility that plaintiff's June 27, 2012 visit to Denver Health was with Dr. Roberts, the ALJ was aware of and discussed the June 27, 2012 note elsewhere in his decision.  *See* R. at 17.  With respect to the opinion's supportability, the ALJ found that the opinion lacked external support in that it was not supported by Dr. Roberts' June 1, 2012 treatment note and lacked internal support in that it did not explain how plaintiff might be limited in the work environment.  The ALJ also concluded that Dr. Roberts' opinion appeared to be based primarily on plaintiff's subjective complaints due to the fact that her treatment notes do not reflect that any provider has observed him responding to internal stimuli. R. at 19.  "A psychological opinion need not be based on solely objective 'tests'; those findings may rest either on observed signs and symptoms or on psychological tests."  *Thomas v. Barnhart*, 147 F. App'x 755,

17

759 (10th Cir. 2005) (unpublished) (quotations omitted).  Thus, an ALJ is not permitted to reject an opinion from a mental health provider solely because it appears to be based upon responses from the patient.  *Id.*  However, that is not what the ALJ did here, noting that no treatment notes reflect a provider observing plaintiff responding to internal stimuli.  That conclusion finds support in the record.  *See* R. at 378 (noting that plaintiff visited hospital complaining of anxiety, but not listing any observations regarding responses to internal stimuli).  With respect to the opinion's consistency with the record as a whole, the ALJ concluded that Dr. Roberts' June 1, 2012 treatment note was inconsistent with plaintiff's claimed limitations and that no provider had observed plaintiff responding to internal stimuli. R. at 19.  On balance, the Court finds that the ALJ's decision to afford Dr. Roberts' opinion little weight is sufficiently explained and supported by substantial evidence.  *See Musgrave*, 966 F.2d at 1374.

Even assuming that plaintiff could establish that Dr. Roberts' opinion was entitled to greater or even controlling weight, Dr. Roberts' opinion does not overwhelm the ALJ's RFC finding.  The Commissioner argues that Dr. Roberts' opinion "provided no information for the ALJ to incorporate into a residual functional capacity finding that considered Plaintiff's specific social functioning, attention, concentration, and memory." *See* Docket No. 20 at 17-21.  The Court agrees with the Commissioner.  Dr. Roberts' opinion cannot reasonably be construed as concluding that plaintiff is disabled under the appropriate definition of the term and provides no suggestion of how his difficulties with mood regulation would manifest in a work environment.  Plaintiff does not argue otherwise and, as a result, fails to establish that any failure to afford Dr. Roberts' opinion greater weight prejudiced him.  *See Harris v. Astrue*, 496 F. App'x 816, 819 n.1

18

(10th Cir. 2012) (unpublished) (noting that burden of showing an error is harmful "normally falls upon the party attacking the agency's determination" (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). The Court that finds plaintiff has failed to identify reversible error in the ALJ's treatment of Dr. Roberts' opinion.[7]

### 3. RFC Finding

Plaintiff argues that, based upon the foregoing arguments, it follows that the ALJ's RFC assessment was not based upon substantial evidence. Docket No. 17 at 20. Plaintiff's argument is conclusory and fails to identify a specific error in the ALJ's decision. Moreover, to the extent this argument is premised upon the success of his foregoing arguments, his foregoing arguments are without merit and so therefore is this one.

Plaintiff argues that the ALJ did not state what weight he gave Dr. Renne's opinion. *Id.* Although the ALJ did not explicitly quantify the weight he assigned Dr. Renne's opinion in typical terms, e.g. "great," "substantial," "lesser," the ALJ discussed Dr. Renne's opinion favorably, concluding that the level of limitations expressed in Dr. Renne's opinion "would not preclude the claimant from performing all work related activity" and discussed the remaining opinions unfavorably, concluding that such opinions were entitled to very little weight. R. at 18. The ALJ's decision therefore indicates that he elevated Dr. Renne's opinion over those medical opinions to which he

---

[7]To the extent plaintiff argues that, in discussing the medical records involving plaintiff's physical injuries, the ALJ should have concluded that such injuries were caused by plaintiff's mental impairments and "not injuries that happen to someone who functions well in his environment," Docket No. 17 at 19, the Court declines to substitute its medical judgment for that of the ALJ.

assigned lesser weight and, although recognizing that Dr. Renne's opinion suggested some limitations, found that none of those limitations precluded plaintiff from performing all work activity.  The Court finds that the ALJ's decision sufficiently identified the weight he gave Dr. Renne's opinion.  *See Lauxman v. Astrue*, 321 F. App'x 766, 769 (10th Cir. 2009) ("The ALJ in this case clearly considered Dr. Murati's opinion because he recited each and every restriction.  . . . Of course, it would have been helpful if the ALJ had elaborated on his treatment of Dr. Murati's opinion, but under these circumstances, the ALJ's decision is adequate for purposes of our review.").

Plaintiff argues that, because the ALJ's RFC does not contain any limitations directly from Dr. Renne's opinion, "it is not clear on what evidence the ALJ based his RFC."  Docket No. 17 at 20.  However, plaintiff concedes that Dr. Renne's opinion did not contain specific functional limitations.  *Id.*  Thus, plaintiff's argument appears to be somewhat circular.  To the extent plaintiff argues that, because the functional limitations in the ALJ's RFC were not explicitly taken from a physician's opinion, the ALJ's RFC is somehow flawed in that respect, plaintiff is incorrect.  "[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record" and there need not necessarily be "specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category."  *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004).  The ALJ in this case was not therefore required to take his RFC findings directly from medical opinion evidence.  *See Chapo v. Astrue*, 682 F.3d 1285, 1288-89 (10th Cir. 2012) ("there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question").

20

Plaintiff cites *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007), in support of his

argument that an ALJ "must explain why he rejects some limitations from an RFC but

accepts others." Docket No. 17 at 20. Plaintiff misinterprets *Haga*. In *Haga*, the Tenth

Circuit held that an ALJ "is not entitled to pick and choose through an uncontradicted

medical opinion taking only the parts that are favorable to a finding of nondisability" and

rejecting contrary parts of the opinion without explaining his reasons for doing so. 482

F.3d at 1208. However, plaintiff does not identify an instance where the ALJ engaged

in such a practice with respect to Dr. Renne's (or any other) opinion and the Court finds

no basis for so concluding. Rather, Dr. Renne concluded that plaintiff's problems and

symptoms were treatable and that appropriate involvement and cooperation in ongoing

therapy could allow plaintiff to function successfully in a work environment within six

months. R. at 275. Moreover, to the extent that the ALJ's RFC finding and Dr. Renne's

findings are inconsistent, the ALJ appears to have resolved such inconsistencies in

plaintiff's favor with respect to plaintiff's ability to follow instructions and interact with co-

workers and supervisors. *Compare* R. at 15, *with* R. at 273, 275. This does not

constitute reversible error. *Cf. Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th

Cir. 2012) (finding that claimant was not prejudiced by ALJ's alleged failure to further

discuss medical opinion because the ALJ noted the "lack of limitations in Dr. Gordon's

opinion and developed a mental RFC consistent with Dr. Gordon's findings in some

areas but more favorable to Ms. Keyes-Zachary than Dr. Gordon's findings in other

areas").

The Court is otherwise satisfied that the ALJ's RFC finding is appropriately

explained and based upon substantial evidence. The ALJ has a duty to "make specific

and detailed predicate findings and to include a sufficient narrative discussion

concerning a claimant's RFC." *Spicer v. Barnhart*, 64 F. App'x 173, 177 (10th Cir.

2003) (unpublished).

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996). Here, the ALJ evaluated the credibility

of plaintiff's claimed physical and mental limitations, concluding that plaintiff's allegation

that he was unable to work due to his back pain and mood was not credible. R. at 15-

16. The ALJ noted that plaintiff's medical history did not support plaintiff's claimed

limitations and that such evidence indicated no more than moderate limitations. R. at

16. The ALJ discounted plaintiff's claimed difficulties in performing daily activities, in

part because the ALJ was unable to attribute such difficulties to plaintiff's medical

conditions. *Id.* The ALJ found that plaintiff's lack of pre-onset date work history

undermined plaintiff's claim that he was unable to work. R. at 16-17. With respect to

plaintiff's back pain, the ALJ found that, although there were no clinically objective

diagnostic findings to support a severe impairment, it was appropriate to view such

evidence in the light most favorable to plaintiff and provide for limitations accordingly.

R. at 17-18. As a result, the ALJ found that plaintiff could not climb scaffolds, ladders,

or ropes or work at unguarded heights or near unguarded hazardous mechanical

equipment.  R. at 15.  With respect to plaintiff's mental limitations, the ALJ discussed

plaintiff's treatment records, including his diagnoses and GAF scores, and Dr. Renne's

opinion, which stated that plaintiff scored normally on the Mini Mental Status Exam.  R.

at 18 (citing R. at 273).  The ALJ noted a conflict between plaintiff's hearing testimony

and what plaintiff told Dr. Renne on the subject of mental symptoms and ability to

interact with co-workers and supervisors.  R. at 17-18.  The ALJ then discussed the

remaining medical opinions in the record, appropriately setting forth his reasons for

assigning them little weight.  By limiting plaintiff to jobs that require no more than simple

instructions and no more than superficial interactions with co-workers and the public,

the ALJ acknowledged that plaintiff had some mental limitations and appears to have

resolved some of the identified conflicts between plaintiff's hearing testimony and Dr.

Renne's opinion in plaintiff's favor.  *See* R. at 15; *see also Keyes-Zachary*, 695 F.3d at

1162-63.  Plaintiff's ability to complete a sustained workday was discussed throughout

the ALJ's decision, with the ALJ concluding that no evidence established that plaintiff

had an inability to work.  The Court therefore concludes that the ALJ's RFC findings are

adequately explained and based upon substantial evidence.

### 4. Step Five

Plaintiff argues that,

> [i]n finding that Mr. Mengesha was capable of returning to her [sic] past work,
> the ALJ stated that he relied on the testimony of the vocational expert, which
> he related was consistent with the Dictionary of Occupational Titles.
> However, the vocational expert was not apprised of all of Mr. Mengesha's
> work-related functional limitations.

Docket No. 17 at 20.  Plaintiff misinterprets the ALJ's decision.  The ALJ actually

reached the opposite conclusion, finding that plaintiff had no past relevant work.  R. at

23

19.  To the extent plaintiff challenges the ALJ's finding that jobs for persons with plaintiff's age, education, work experience, and RFC existed in significant numbers in the national economy, plaintiff fails to identify reversible error.  Plaintiff argues that the VE was not precisely apprised of all plaintiff's work-related limitations, but fails to identify any limitations that the VE was not privy to.  The Court therefore rejects plaintiff's argument as unsupported.  Moreover, an ALJ is required to include in a hypothetical question to the VE "all (and only) those impairments borne out by the evidentiary record."  *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995).  The ALJ asked the VE the following question:

> Q  So, Ms. Paulini, I want to give you a hypothetical.  A 27 year old person with a high school level education and the same past work experience as the claimant and ability to do medium work with the following specific restrictions and requirements not to climb scaffolds, ladders and ropes, not required to work at unguarded heights or near unguarded hazardous mechanical equipment.  Not required to understand, remember and carry out more than simple instructions.  Not required to have more than superficial interaction with coworkers.  Not required to interact with the public.  In your opinion, are there any jobs in the national economy the same hypothetical person could perform and if so, how many?

R. at 59.  In response, the VE identified two jobs: industrial cleaner, DOT 381.687-018, with 357,400 jobs in the national economy and commercial cleaner, DOT 381-687-014, with 255,300 jobs in the national economy.  *Id.*  The VE further testified that her testimony did not conflict with the DOT and that she additionally relied on her own professional experience.  R. at 58-59.  The ALJ's hypothetical to the VE accurately described plaintiff's age, education, work experience, and the ALJ's RFC.  *Compare* R. at 15, *with* R. at 59.  Plaintiff does not identify what, if any, limitations the ALJ failed to relate to the VE and, upon review, no such limitations are apparent to the Court.

*Shepherd v. Apfel*, 184 F.3d 1196, 1203 (10th Cir. 1999) ("The ALJ is only required to ask hypotheticals encompassing impairments that find support in the record."). Plaintiff has therefore failed to establish reversible error in the ALJ's decision at Step Five.

## III. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the decision of the Commissioner that Izra H. Mengesha was not disabled is **REVERSED** and **REMANDED** for proceedings consistent with this opinion.

DATED September 30, 2015.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge